The CITY OF SEATTLE, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 88–1716.

United States Court of Appeals, District of Columbia Circuit.

Argued May 2, 1989.

Decided Sept. 1, 1989.

Walter L. Williams, with whom Brian V. Faller, Seattle, Wash., was on the brief, for petitioner.

Robert E. Solomon, Atty., F.E.R.C. ("FERC"), with whom Catherine C. Cook, Gen. Counsel, and Joseph S. Davies, Deputy Sol., FERC, Washington, D.C., were on the brief, for respondent.

Before WALD, Chief Judge, and RUTH BADER GINSBURG and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The City of Seattle petitions for review of Federal Energy Regulatory Commission ("FERC" or "Commission") orders holding Seattle liable for certain annual charges, which were billed in 1985, for its use of federal lands to operate a Commission-licensed hydroelectric project from 1977 to 1985. FERC ruled that because the City had agreed to subject its license to all the Federal Power Act's provisions and related regulations, the Commission had the authority to increase Seattle's annual charges based on a new ratemaking methodology introduced in its 1977 regulations. The City argues that the license fixed annual charges at a much lower dollar amount, that FERC billed Seattle (and received) this

amount for each year from 1977 through 1983, and that the Act bars the Commission from increasing annual charges unilaterally and without notice.

We conclude that the City agreed to subject its license to FERC's authority, under section 10(e) of the Act, to adjust annual charges, but reject the Commission's claim that it was empowered to increase Seattle's annual charges *retroactively*. We therefore hold that the Commission had the authority to increase the charges prospectively, beginning with 1984 (the first year for which FERC exercised its power), but vacate the charges assessed retroactively for the years 1977 through 1983.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

Section 4(e) of the Federal Power Act ("FPA" or "Act"), 16 U.S.C. § 797(e) (1982 & Supp. V 1987), authorizes FERC to issue licenses to municipalities to construct and operate hydroelectric facilities. Section 6 of the Act, *id.* § 799, provides:

Licenses ... shall be issued for a period not exceeding fifty years. Each such license shall be conditioned upon acceptance by the licensee of all of the terms and conditions of this chapter and such further conditions, if any, as the Commission shall prescribe in conformity with this chapter, which ... shall be expressed in said license. Licenses ... may be altered ... only upon mutual agreement between the licensee and the Commission after thirty days' public notice.

Section 10, *id.* § 803, describes certain general licensing conditions. Subsection (a) grants FERC "authority to require the modification of any project ... before approval." Subsection (e)(1) requires each licensee to pay

*reasonable annual charges* in an amount to be fixed by the Commission for the purpose of reimbursing the United States for the costs of the administration of this subchapter; [and] *for recompensing it for the use, occupancy, and enjoyment of its lands or other proper-*

*ty; ... and any such charges may be adjusted from time to time by the Commission as conditions may require ....* (emphasis added).

FERC's fixing of annual charges and other costs is currently governed by 18 C.F.R. §§ 11.1–11.21 (1988). In 1942, section 11.21 provided that FERC's predecessor, the Federal Power Commission ("FPC"), would calculate yearly charges for use of most federal land by multiplying the national average land value per acre (then $50) by a four percent interest rate, with annual charges for transmission line rights-of-way fixed at one-half this ordinary usage charge. On December 29, 1976, the FPC issued Order No. 560, 56 F.P.C. 3860, which amended section 11.21 to reflect the increase in average land value (to $150 an acre) and to replace the four percent interest rate with a fluctuating rate to be revised annually according to certain government interest indices.

B. Seattle's Hydroelectric License

In 1927, the FPC issued the City of Seattle a fifty-year license for the Skagit River Project No. 553 ("Project 553") in northwestern Washington, which acknowledged Seattle's authority to operate the existing Gorge Dam, reservoir, and powerhouse and authorized the City to construct and operate the Diablo hydropower project. Article 24 of the license prescribed Seattle's obligation to pay "reasonable annual charges" to compensate the United States for the use of federal land and for the FPC's administrative costs. The charges would be determined in accordance with FPC regulations (issued pursuant to section 10(e) of the Federal Water Power Act, 41 Stat. 1063, 1069 (1920) ("FWPA"), the FPA's predecessor).

In a July 23, 1937 order, the FPC authorized the amendment of the Project 553 license to permit construction of the Ruby (now Ross) Dam and powerplant upstream from Diablo. The FPC made Seattle's license "subject to the [newly enacted FPA] ... [and] to the rules and regulations of the Commission thereunder," and amended article 24 to provide for the City's payment

"of annual charges in the amount hereinbefore found reasonable."

On June 9, 1942, the FPC modified and supplemented its 1937 order and submitted to Seattle "Amendment No. 1," which would be effective retroactively to July 23, 1937 and make two important changes. First, Amendment No. 1 incorporated the clause in the 1937 order subjecting the Project 553 license to "all the terms and provisions of the [Federal Power] Act and of the rules and regulations of the Commission pursuant thereto...." Second, it amended article 24 to delete reference to regulations promulgated under the FWPA and instead required the City to pay annual charges "[s]ubject to the provisions of Section 10(e) of the [FPA]," and fixed annual charges at $215.36 for federal land used for transmission lines and $1,066.57 for land used for other purposes. Seattle accepted Amendment No. 1 on January 5, 1943.

Article 24 of the Project 553 license has been altered a number of times to increase annual charges. Most recently, in 1964, the FPC fixed annual charges at $320.40 for transmission lines on federal lands and $1,830.89 for other uses. *City of Seattle,* 31 F.P.C. 1268, 1273 (1964). Since that time, the Commission has never changed these dollar amounts.

On July 5, 1977, six months after the effective date of Order No. 560 (which established a fluctuating per acre annual charge), the FPC amended the Project 553 license in Opinion No. 808, 59 F.P.C. 196 (1977), *aff'd sub nom. Swinomish Tribal Community v. FERC,* 627 F.2d 499 (D.C. Cir.1980). Opinion No. 808 authorized Seattle to raise the height of the Ross Dam, which would create a reservoir extending for several miles into British Columbia. While article 24 was revised to reflect the project's increased authorized installed capacity of 1,057,000 horsepower, it retained the annual charges for land use at the 1964 levels. 59 F.P.C. at 236–37.

The FPC, however, did add articles 66 and 67 to the license. *See id.* at 242. Article 66 required Seattle, "within one year after completion of construction" of

the Ross Dam extension, to file revisions to Exhibits F and K documenting the "acreage of project lands, including U.S. lands, within the project boundary...." Article 67 provided: "The Commission reserves the right to determine additional annual charges, if any, for the use and occupancy of U.S. lands until after revised Exhibits F and K are filed."

As it turned out, articles 66 and 67 never took effect because of a 1984 agreement in which Seattle cancelled the planned increase in the height of Ross Dam (which would have flooded lands on the British Columbia side of the Skagit River), and British Columbia in return promised to deliver to Seattle a quantity of electric power equivalent to that which would have been generated by raising the dam. This agreement was approved by treaty. *See Treaty Between the United States of America and Canada Relating to the Skagit River and Ross Lake, and the Seven Mile Reservoir on the Pend D'Oreille River*, Apr. 2, 1984, Sen. Treaty Doc. No. 98–26, 98th Cong., 2d Sess. (1984), —— T.I.A.S. —— ("Treaty"). If British Columbia ever breached the agreement, Seattle would have the right to increase the height of Ross Dam pursuant to Opinion No. 808. *Id.* art. II, § 1(a).

On October 25, 1977, two days before Seattle's fifty-year Project 553 license was to expire, the Commission issued the City a one-year license containing the same terms and conditions as the existing license, to be reissued annually until the agency ruled on Seattle's new license application. FERC's subsequent billings, for the years 1977 through 1983, reflected annual charges to the City of $320.40 for use of 95.5 acres of federal land for transmission lines and $1,830.89 for use of 15,200.41 acres for other project purposes.

## C. The Billing Dispute and FERC Proceedings

On August 22, 1985, the Commission sent Seattle a bill requesting payment of $979,633 in additional charges assessed for its use of federal land from 1977 through 1983. In a letter dated October 2, 1985, FERC asserted that its "grossly low" earlier assessments were not intended as final determinations of section 10(e) "reasonable annual charges" for the years 1977 through 1983 and that the revised charges had been computed according to Order No. 560's "fluctuating interest rate" methodology. On October 8, the City petitioned for a declaratory order that these retroactive increases violated article 24 of the Project 553 license, which specified the dollar amounts of the annual charges owed by Seattle.

On August 3, 1987, the Commission denied the petition and ruled that Seattle must pay annual charges as adjusted by FERC pursuant to FPA section 10(e) and regulations promulgated thereunder. *City of Seattle*, 40 F.E.R.C. ¶ 61,135. The Commission reasoned that, by accepting the 1943 amendments to its license, Seattle had agreed to become subject to all the Act's provisions and related rules and regulations. *Id.* at 61,394. On July 29, 1988, FERC denied the City's petition for rehearing. 44 F.E.R.C. ¶ 61,168. Seattle has appealed.

## II. Discussion

The Commission's interpretation of the hydroelectric licenses it issues and oversees is entitled to deference. *Pacific Gas & Elec. Co. v. FERC*, 720 F.2d 78, 84 (D.C.Cir.1983); *cf. Panhandle Eastern Pipe Line Co. v. FERC*, 881 F.2d 1101, 1118 (D.C.Cir.1989) (deferential standard of review applicable to FERC's contract construction). Similarly, the agency's construction of any FPA provision that is silent or ambiguous with respect to Congress' intent must be upheld if "permissible." *See Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Nevertheless, if we find a Commission order to be arbitrary, capricious, or unlawful, we must set it aside. 5 U.S.C. § 706(2)(A). Our review will focus on the reasonableness of FERC's interpretation of the Project 553 license and the FPA provisions incorporated therein.

A. Applicability of FPA Sections 6 & 10(e) to the License

The major dispute in this case concerns FERC's ruling that

> [s]ince Section 10(e) of the FPA gives the Commission authority to adjust annual charges from time to time, incorporation of the FPA, including Section 10(e), in the license, constituted a reservation of authority by the Commission to adjust annual charges thereafter, and acceptance of the amendment constituted an agreement by Seattle to that arrangement. Under these circumstances, Seattle's consent to a particular adjustment is not required under Section 6 of the FPA.

44 F.E.R.C. at 61,562 (footnote omitted); *accord* 40 F.E.R.C. at 61,394. On appeal, FERC reiterates that because the City in 1943 accepted the amendments incorporating the FPA's provisions into the license, it agreed to comply with section 10(e) of the Act, which declares that annual charges "may be adjusted from time to time by the Commission as conditions may require." 16 U.S.C. § 803(e)(1). FERC asserts that its adjustment of the article 24 annual charges reflected the changes in methodology for calculating such charges mandated by Order No. 560 (amending 18 C.F.R. § 11.21).

Seattle counters that the Project 553 license is subject to all of the FPA, not simply section 10(e). The City particularly emphasizes section 6, which provides that licenses "may be altered ... only upon mutual agreement between the licensee and the Commission after thirty days' public notice." 16 U.S.C. § 799. Seattle argues that where a license provision fixes annual charges at a precise dollar amount with no authorization for increases based on amendments in FERC's regulations, any changes in those charges "alter" the license within the meaning of section 6. As article 24 of the Project 553 license sets the City's annual payments at $320.40 for federal land used for transmission lines and $1,830.89 for land utilized for other purposes, Seattle asserts that the Commission's retroactive increase in those charges

for the period 1977–1983 constituted a unilateral amendment of the license in violation of section 6 of the FPA.

FERC responds that section 6, which prohibits it from unilaterally altering licenses, *does not apply* here because the City, by accepting the 1937 and 1943 amendments, *agreed* to allow the Commission at its discretion to adjust annual charges based on its regulations. *See* 44 F.E.R.C. at 61,562.

■ We conclude that FERC has the authority to increase Seattle's annual charges, but only prospectively. The 1943 amendment to the Project 553 license made the license "subject to all the terms and conditions of the Act, and of the rules and regulations of the Commission pursuant thereto...." The amendment to article 24 explicitly made annual charges "[s]ubject to the provisions of Section 10(e) of the Act." Although this language was not repeated in the subsequent amendments, we find reasonable FERC's interpretation that the license, as amended in 1943, nonetheless remains subject to the Commission's right to adjust annual charges pursuant to section 10(e). Thus, Seattle was on notice that the Commission had the authority to revise the annual charges set forth in article 24 of the 1977 amendment (Opinion No. 808). FERC first asserted its right to increase these charges in its June 27, 1985 billing for the City's 1984 usage. Therefore, we hold Seattle liable for the higher charges beginning in 1984.

■ We must, however, reject the Commission's assertion that it had the authority to adjust the annual charges for the period from 1977 through 1983 *retroactively*. Nothing in either the FPA or the Project 553 license confers such power; hence, the deferential standard of review owed to FERC's statutory and contractual interpretations is not applicable. The Commission's failure to provide any notice of the increase in annual charges frustrated the City's settled expectations regarding license expenses. Allowing such unilateral increases in fixed charges would undercut the FPA's policy favoring the protection of licensees' expectations. *See Pacific Gas*, 720 F.2d at 83, 87. In the context of a

FERC ratemaking proceeding under FPA section 206, Judge (now Justice) Scalia declared:

> ... the provision must be read in light of the Federal Power Act's primary purpose of protecting the utility's customers.... The wholesale purchasers of electricity cannot plan their activities unless they know the cost of what they are receiving.... Providing the necessary predictability is the whole purpose of the well established "filed rate" doctrine, which "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 [101 S.Ct. 2925, 2930, 69 L.Ed.2d 856] ... (1981).

*Electrical Dist. No. 1 v. FERC*, 774 F.2d 490, 492–93 (D.C.Cir.1985) (citations omitted). The situation before us is analogous: Seattle cannot project the costs it must recover from its customers unless it knows what FERC intends to charge for the City's use of federal lands.

The agency's practice in administering the Project 553 license also belies its present assertion of unilateral authority to change Seattle's charges retroactively and without notice. From 1937 to 1984, the Commission billed the City each year for annual charges based on the article 24 dollar amounts and never indicated that these billings were anything but final. In these circumstances, Seattle quite reasonably assumed that adjustments, if any, would be prospective; otherwise, FERC would have unlimited authority to impose retroactive increases. Acting in justifiable reliance upon its understanding that earlier billings were not subject to revision, the Seattle Department of Lighting did not increase its rates to consumers to protect itself against such a contingency, and cannot now do so retroactively. *Cf. id.* at 493.

In sum, section 10(e) of the FPA authorized the Commission to "adjust" Seattle's annual charges set forth in article 24 of the Project 553 license, but only *prospectively*. Permitting FERC to impose these charges retroactively would vitiate the statutory goal of safeguarding licensees' expectations.

**B. Order No. 560 and Articles 66–67 of Opinion No. 808**

The Commission next argues that its practice during the first fifty years it administered the Project 553 license is not relevant to the 1977–1983 annual charges at issue because post–1976 rates are governed by Order No. 560, 56 F.P.C. 3860. As noted above, Order No. 560 amended 18 C.F.R. § 11.21 to establish charges for the use of federal land in hydroelectric projects that more closely approximated its true market value, thus ensuring that the United States was adequately compensated. FERC emphasized this point in the orders under review:

> It is unreasonable to believe that the Commission intended to perpetuate a charge of some $0.12 per acre for Seattle's licensed project while at about the same time it was increasing the land use charge nationwide from $2.40 to $5.74 an acre for 1977.

40 F.E.R.C. at 61,395. *See also* 44 F.E.R.C. at 61,563 (rejecting Seattle's claim to such low rates as "untenable").

The central problem with FERC's argument is that instead of ordering Seattle to change its payments to conform to the new Order No. 560 methodology, six months *after* Order No. 560 was handed down the Commission reincorporated article 24's annual dollar charges in the amendments to the Project 553 license contained in Opinion No. 808. *See* 59 F.P.C. at 236–37. Furthermore, two days before the City's license was to expire on October 27, 1977, FERC renewed it for one year under these same terms and conditions and provided that "a new annual license will be issued each year thereafter" pending the issuance of a new permanent license. Although Opinion No. 808 may indeed have resulted in granting the City disproportionately low annual charges, the Commission cannot retroactively rescind that order, which unambiguously approved such amounts. The parties' clear understanding is manifested by FERC's acceptance of Seattle's pay-

ments, for the years 1977 through 1983, of annual charges based on the amounts set forth in article 24.

Finally, the Commission suggests that articles 66 and 67, added to the Project 553 license by Opinion No. 808, provide an independent basis for FERC to increase annual charges retroactively. Article 66 required Seattle, "within one year after completion of construction" of the Ross Dam extension, to revise Exhibits F and K in order to identify the amount of United States land then being used for Project 553. *See* 59 F.P.C. at 242. Article 67 reserved the Commission's "right to determine additional annual charges, if any," for the City's use of "U.S. lands" until after these revised exhibits were filed. *Id.*

In its initial order, the Commission asserted that article 67's reservation of the right to redetermine annual charges for use of federal land constituted a general grant of authority for FERC to recalculate annual charges for "the entire project, rather than [for] just the changes to the Ross development that were planned...." *See* 40 F.E.R.C. at 61,395. In its order denying rehearing, the Commission explained that it "did not suggest that Articles 66 and 67 provide the authority to raise annual charges," but rather that they "reserved to the Commission the authority to calculate the land use charges at a later date...." 44 F.E.R.C. at 61,563 n. 23.

We reject FERC's argument that articles 66 and 67 implied the reservation of a right to impose retroactive rate increases. Those articles clearly contemplated that Seattle would use additional federal land in connection with raising the Ross Dam, then submit documents identifying the number of acres appropriated for that purpose within a year after completing the work; the Commission reserved the right to reexamine the appropriate level of charges in light of the City's use of that additional acreage. Because the Treaty unexpectedly scuttled the expansion of the Ross Dam, however, the project was never completed. Exhibits F and K were never filed, and FERC's reserved right never came into effect.

We also dismiss the Commission's related assertion that it based its billings for the years 1977 through 1983 on article 24, rather than on Order No. 560 and the revised regulations, because it could not determine the number of additional acres the City would utilize in raising the Ross Dam. This argument borders on the frivolous. In each of those years, FERC knew the exact number of acres used by Seattle. Any adjustments to account for additional land used for the Ross Dam project would be made *prospectively* (i.e., after the dam was raised) and would therefore not affect the calculations for the years at issue. Thus, FERC had no reason to postpone any increases in charges on the existing acreage. If the Commission had intended its reservation of rights to apply to charges prior to the completion of the dam extension, the logical place to have stated the reservation would have been in article 24, not articles 66 and 67.

## C. Effect of the Treaty

Seattle's final argument is that the U.S.–Canadian Treaty restricts FERC's ability to increase annual charges. Article II of the Treaty provides:

1. (a) In the event that British Columbia discontinues its obligation to deliver electrical power to Seattle under the Agreement or an arbitration tribunal determines that conduct of British Columbia constitutes a material breach of the Agreement, Seattle is, in accordance with and subject to the terms and conditions specified in this Treaty and the Agreement, authorized to raise the level of Ross Lake ... by means of construction and operation of Ross Dam ... subject to the terms and conditions contained in Opinion No. 808 ... and in other actions of [FERC] in implementation thereof, including provisions for High Ross Dam in the relicensing by [FERC] of Seattle's Project No. 553, of which Ross Dam is a part.

(b) This authority is to be exercised by Seattle at its option, without regard to any United States law, decision, regulation or order which might be argued as

limiting or negating this authority, ... and provided further that unless and until ... Ross Lake is thus raised, Seattle shall not be required to pay any increase in annual charges attendant thereupon under section 10(e) of the [FPA].

Seattle interprets the Treaty as incorporating the terms and conditions of Opinion No. 808 (including the dollar amounts set out in article 24) and continuing them in effect until the Treaty expires in the year 2066. According to the City, section 1(a) limits FERC's authority to "implementing" Opinion No. 808, and therefore precludes the Commission from altering the annual charges, which assertedly may not be increased unless and until the project to raise Ross Dam is completed.

Seattle's argument is long on ingenuity but short on plausibility. Article II of the Treaty is triggered only "[i]n the event that British Columbia discontinues its obligation to deliver electrical power to Seattle" or otherwise breaches the Agreement. As the City has failed to show that these events have occurred (or are likely to occur), the provisions of article II are not yet applicable. Nothing in the Treaty indicates the United States government's intent to remove the Project 553 license from FERC's jurisdiction until these events transpire and to freeze Seattle's payments at the 1977 rate for nearly a century.

### III. CONCLUSION

Although the Commission had the power to adjust Seattle's annual charges prospectively, neither the Act nor the license authorized FERC to impose retroactive rate increases. Accordingly, we grant the petition for review and vacate the Commission's orders holding Seattle liable for extra annual charges from 1977 through 1983.

*So ordered.*