PLATTE RIVER WHOOPING CRANE CRITICAL HABITAT MAINTENANCE TRUST, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

State of Wyoming, Central Nebraska Public Power and Irrigation District, Nebraska Public Power District, Nebraska Water Users, Inc., Intervenors.

NEBRASKA WILDLIFE FEDERATION, Sierra Club, National Audubon Society, American Rivers, Inc., Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

State of Wyoming, Nebraska Public Power District, Central Nebraska Public Power and Irrigation District, Intervenors.

CENTRAL NEBRASKA PUBLIC POWER AND IRRIGATION DISTRICT, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

State of Wyoming, Nebraska Public Power District, Central Nebraska Public Power and Irrigation District, Nebraska Water Users, Inc., Nebraska Wildlife Federation, Sierra Club, National Audubon Society, American Rivers, Inc., Intervenors.

NEBRASKA PUBLIC POWER DISTRICT, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

State of Wyoming, Central Nebraska Public Power and Irrigation District, Nebraska Public Power District, National Audubon Society, Nebraska Wildlife Federation, Sierra Club, American Rivers, Inc., Intervenors.

PLATTE RIVER WHOOPING CRANE CRITICAL HABITAT MAINTENANCE TRUST, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Central Nebraska Public Power and Irrigation District, State of Wyoming, Nebraska Public Power District, Nebraska Water Users, Inc., Intervenors.

Nos. 90–1397, 90–1399 to 90–1401 and 90–1504.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 4, 1992.

Decided April 17, 1992.

As Amended April 27, 1992.

Rehearing and Rehearing En Banc Denied June 23, 1992.

Sam Kalen, with whom Gary D. Bachman, Washington, D.C., for Cent. Nebraska Public Power and Irrigation Dist., and William J. Madden, Jr., Washington, D.C., for Nebraska Public Power District, were on the joint brief, for petitioners in Nos. 90–1400 and 90–1401 and intervenors in Nos. 90–1397, 90–1399 and 90–1504.

William Maxwell Hathaway, with whom Abbe David Lowell and Sue Ellen Russell, Washington, D.C., for Platte River Whooping Crane Critical Habitat Maintenance Trust, and Hope M. Babcock, Washington, D.C., for Nat. Audubon Soc., Nebraska Wildlife Federation, Sierra Club and American Rivers, Inc., were on the joint brief, for petitioners in Nos. 90–1397, 90–1399 and 90–1504 and intervenors in Nos. 90–1400 and 90–1401.

Samuel Soopper, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, and Jerome M. Feit, Sol., Washington, D.C., were on the brief, for respondent in Nos. 90–1397, 90–1399, 90–1400, 90–1401 and 90–1504.

Dennis C. Cook, Donald M. Gerstein, Cheyenne, Wyo., Adelia S. Borrasca, Washington, D.C., and Lawrence J. Wolfe, Cheyenne, Wyo., were on the brief, for intervenor State of Wyo. in Nos. 90–1397, 90–1399, 90–1400, 90–1401 and 90–1504.

Jerald L. Hill and Mark J. Bredemeier, Kansas City, Mo., were on the brief, for intervenor Nebraska Water Users, Inc., in Nos. 90–1397 and 90–1504. Michael O. Johanns, Lavern R. Holdeman, Lincoln, Neb., and Richard P. Hutchison, Kansas City, Mo., also entered appearances for intervenor.

Ronald J. Wilson, Washington, D.C., entered an appearance for petitioner, Sierra Club Legal Defense Fund in No. 90–1399.

Before: EDWARDS, SILBERMAN, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This case, which originally involved only a dispute between environmental groups and the Federal Energy Regulatory Commission (FERC), comes back to us for a second time. In *Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 876 F.2d 109 (D.C.Cir.1989) (*Platte River I*), we remanded to the Commission to evaluate the need for wildlife protective conditions in the annual licenses issued to two hydroelectric projects on the Platte River. FERC did find a need for environmental protections and issued an order imposing conditions on one of the licensees. But since it concluded that it lacked statutory authority to impose the conditions on the other licensee, and some of those conditions would be effective only if applied to both, FERC subsequently stayed its order in part. The environmental groups generally assert that FERC was insufficiently aggressive or imaginative in interpreting its statutory authority; the project owners, Central Nebraska Public Power and Irrigation District (Central) and Nebraska Public Power District (NPPD) ("the Districts"), claim that even the conditions FERC thought it had power to impose were adopted without substantial evidence and with too much emphasis on environmental concerns. We deny all of the petitions for review.

I.

The environs of the Platte River in Central Nebraska are home, in different seasons, to a number of threatened or endangered migratory bird species, including the whooping crane, the bald eagle, the interior least tern, and the piping plover. A 53–mile stretch of the "Big Bend" reach of the river has been designated as "critical habitat" for the whooping crane, and in 1978 the Platte River Whooping Crane Critical Habitat Maintenance Trust (Trust) was established to " 'protect and maintain ... the physical, hydrological and biological integrity of [the] area so that it may continue to function as a life-support system for the whooping crane and other migratory species which utilize it.' " *Platte River I*, 876 F.2d at 110.

Central and NPPD were licensed in 1941 to operate hydroelectric facilities upstream from the habitat. The two projects work as a unit to provide water for power production, irrigation, and recreational uses along the Platte River valley. Central, the larger of the two, owns and operates Lake McConaughy, the reservoir that provides most of the water storage for both projects. In 1984, the Districts, anticipating the expiration of their original licenses in June 1987, applied to FERC for new licenses. By early 1987 it became apparent that the existing licenses would expire before any new licenses could be issued. The Federal Power Act (FPA or "the Act"), 16 U.S.C. §§ 791a–825r, requires the Commission, in this situation, to "issue from year to year an annual license to the then licensee under the terms and conditions of the existing license until ... a new license is issued." *Id.* § 808(a)(1). The Trust intervened, asking FERC to consider inserting environmental protective conditions into the Districts' annual licenses. The Commission concluded that it could amend NPPD's annual license, though not Central's. It declined to take any action, however, on the ground that it lacked sufficient information to establish appropriate conditions.

In *Platte River I*, we held that the Commission abused its discretion by refusing even to explore the need for protective conditions. *See* 876 F.2d at 119. We agreed with FERC that it has authority to impose conditions unilaterally on NPPD, but not on Central, though we suggested that the Commission could seek Central's cooperation in implementing any conditions deemed necessary. *See id.* at 114. Noting "[t]he importance of assessing the need for *interim* protection—not necessarily resolving the ultimate environmental/power issues but considering temporary, 'rough and ready' measures to prevent irreversible en-

vironmental damage pending relicensing," *id.* at 116 (emphasis in original), we remanded for further proceedings.

The Commission's staff then sought recommendations from interested parties. The Trust, several conservation groups (American Rivers, Inc., National Audubon Society, Nebraska Wildlife Federation, and Sierra Club), and the Fish and Wildlife Service and Nebraska Game and Parks Commission ("environmental agencies") submitted various proposals for protective conditions, which were subsequently consolidated; the Districts filed a statement arguing that no need for interim conditions had been demonstrated. The Commission convened a settlement meeting that proved unsuccessful. After further negotiations failed and both sides filed additional statements of position, studies, and other materials, the Commission issued its *Interim License Conditions Order. See Central Nebraska Public Power and Irrigation District and Nebraska Public Power District, Project Nos. 1417–012 and 1835–025*, 50 F.E.R.C. ¶ 61,180 (1990).

The Commission interpreted our opinion in *Platte River I* to call for something less than the full balancing of competing environmental and developmental interests envisioned under sections 4(e) and 10(a)(1) of the FPA, 16 U.S.C. §§ 797(e), 803(a); it thought that under our "rough and ready" language interim conditions were justified since emergency measures were necessary to prevent irreversible environmental damage. *See Interim License Conditions Or-*

der at 61,531–32. FERC concluded that "absent interim measures, project operations will continue to adversely affect Platte River habitat, impeding the recovery of endangered or threatened bird species populations ... and thereby may affect the continued existence of these species and result in irreversible environmental damage." *Id.* at 61,532. It found that those operations contribute to channel narrowing and increased vegetation, both of which adversely affect whooping cranes, which need a habitat characterized by wide channels and unvegetated substrate for roosting. *See id.* at 61,533–36. Channel narrowing and increased vegetation also adversely affect the nesting habitat of interior least terns and piping plovers by forcing them to nest at lower elevations and in sand pits where they are vulnerable to predators and nest inundation. *See id.* at 61,536–38. And project operations diminish water flows, thereby reducing available food sources for terns, plovers, and bald eagles. *See id.* at 61,537–39.

Accordingly, FERC approved (with slight modifications) the conditions proposed by the Trust, conservation groups, and environmental agencies. NPPD's annual license was amended to include three new articles, two of which are relevant to this case: Article 400, which specifies minimum and maximum flows, and Article 401, which mandates the development and maintenance of eight permanent nesting sites for terns and plovers.[1] *See id.* at 61,541–42. Adhering to its earlier determination that it

---

1. Article 400, as amended in *Nebraska Public Power District, Project No. 1835–028*, 51 F.E.R.C. ¶ 61,040 (1990), reads:

 *Article 400.* To protect federally listed endangered and threatened species and designated whooping crane critical habitat, the licensee shall operate the project, in cooperation with [Central], when the previous end-of-the-month volume stored in Lake McConaughy is greater than 1.3 million acre feet (Maf), to maintain instream flows in the Platte River as measured at the U.S. Geological Survey gage at Grand Island as follows:

 (1) a 1,100–cubic–foot–per–second (cfs) mean monthly flow from November 16 to March 22 each year to maintain bald eagle wintering habitat, forage fish habitat, and wet meadows for whooping cranes;

 (2) a 2,000–cfs mean monthly flow during the whooping crane's spring (March 23

through May 10) and fall (September 16 through November 15) migration each year, for the maintenance of riverine whooping crane roosting habitat; and

 (3) a mean monthly flow of 800 cfs and not more than 2,500 cfs during the interior least tern and piping plover nesting season, May 11 through September 15 each year, to provide dry nest sites, water barriers around nesting colonies to reduce predation and human disturbance, and to maintain forage fish; When the previous end-of-the-month volume stored in Lake McConaughy is equal to or greater than 0.9 Maf and equal to or less than 1.3 Maf, the licensee, to the extent practicable and in cooperation with [Central], shall maintain a mean daily flow of approximately 400 cfs, regardless of the time of year, as measured at the Grand Island gage. When the previous end-of-the-month volume stored in

lacked authority to impose conditions unilaterally on Central, *see id.* at 61,530, the Commission sought Central's voluntary cooperation in implementing the conditions. *See id.* at 61,532, 61,541–42. It also refused a request by the environmental agencies and conservation groups that the Districts be prohibited from entering new irrigation contracts pending relicensing. *See id.* at 61,541.

The Districts, the Trust, and the conservation groups petitioned FERC for rehearing. NPPD requested a stay of the order, arguing that without Central's voluntary compliance it would be unable to meet the minimum flow requirements. After NPPD presented evidence that Central had declined to cooperate, the Commission granted a stay of the minimum flow requirements "until further action by the Commission," but it left the maximum flow regime and the nesting site requirement intact. *Central Nebraska Public Power and Irrigation District and Nebraska Public Power District, Project Nos. 1417–012 and 1835–034,* 51 F.E.R.C. ¶ 61,256, at 61,730, 61,733–34 *(Stay Order), rehearing denied,* 52 F.E.R.C. ¶ 61,339 (1990). On the same day, it denied all requests for rehearing of the *Interim License Conditions Order. See Central Nebraska Public Power and Irrigation District and Nebraska Public Power District, Project Nos. 1417–013 and –015, 1835–027 and –032,* 51 F.E.R.C. ¶ 61,257 (1990) *(Order on Rehearing).* Consolidated before us are the petitions for review of the *Interim License Conditions Order,* the *Stay Order* and the orders denying rehearing of each.

## II.

## A.

■ Section 6 of the FPA provides that licenses issued under the Act can only be altered "upon mutual agreement between the licensee and the Commission." 16 U.S.C. § 799. Throughout this litigation, FERC has interpreted section 6 to preclude it from amending annual licenses absent an express reservation of modification authority, or "reopener clause," in the original license. Since there is no such clause in Central's original license, the Commission has declined unilaterally to insert wildlife protective conditions into Central's annual license. *See Interim License Conditions Order* at 61,530–31 & 61,530 n. 27. We accepted this determination in *Platte River I. See* 876 F.2d at 113–14.

The Trust now seeks to reargue the point indirectly by contending that FERC has authority under *other* sections of the FPA to condition Central's annual license. It points to section 4(e), which provides in part that the Commission, when deciding whether to issue *"any* license ... for any project," must consider environmental interests, 16 U.S.C. § 797(e) (emphasis added), and to section 10(a), which requires FERC to determine that "[*a*]*ll* licenses" it issues "will be best adapted to a comprehensive plan for," *inter alia,* the protection of wildlife, *id.* § 803(a)(1) (emphasis added). It also suggests a number of more draconian measures that the Commission might take under the FPA—including giving Central's license to another applicant or assuming control of the project itself—and asserts that these greater powers necessarily include the lesser power to impose interim protective conditions.

■ The Commission, to be sure, has acknowledged that it may be required to impose more stringent environmental conditions when and if it grants *new* licenses

Lake McConaughy is less than 0.9 Maf, no releases are required to maintain instream flows.
This mode of operation may be temporarily modified if required by flood conditions beyond the licensee's control.
*Id.* at 61,082. Article 401 provides, in relevant part:
 *Article 401.* To protect federally listed endangered interior least terns and threatened piping plovers, the licensee in cooperation and consultation with the U.S. Fish and Wildlife Service, the Nebraska Game and Parks Commission, the [Trust], and [Central], shall[ ] develop and maintain or provide for the development and maintenance of eight permanent 5- to 10-acre sites for the interior least tern and piping plover nesting habitat, safe from inundation during the nesting season, in the Central Platte River.
*Interim License Conditions Order* at 61,542.

to Central and NPPD. *See Order on Rehearing* at 61,753 n. 114. But FERC maintains that the general terms of sections 4(e) and 10(a) apply to new licenses, not annual licenses; in other words, they do not trump the statute's specific requirements that annual licenses issue "under the terms and conditions of the existing license," 16 U.S.C. § 808(a)(1), and that licenses only be altered "upon mutual agreement," *id.* § 799. Although we recognize the incentives for delay that the statutory scheme creates for licensees such as Central and NPPD, we cannot say that the Commission's interpretation of the Act is unreasonable. *See City of Seattle v. FERC*, 883 F.2d 1084, 1087 (D.C.Cir.1989). That the Commission could revoke Central's license under certain circumstances, moreover, surely does not mean it has the power to impose protective conditions not authorized by the Act.[2]

▮ The Trust indefatigably argues that, notwithstanding the Commission's general interpretation of the structure of the Act, FERC can and should impose conditions on Central. Relying on *Pacific Gas & Electric Co. v. FERC*, 720 F.2d 78 (D.C.Cir.1983), the Trust contends that section 6 is subject to a "reasonableness" exception and permits nonconsensual amendments that constitute only "minor encroachment[s]" on licensees' rights. Alternatively, it asserts that Central's original license actually does contain a reopener clause for the purpose of imposing emergency habitat flows. And it maintains that section 7 of the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2), requires FERC to amend Central's license.

Putting aside the question whether the conditions can be characterized as *de minimis, Pacific Gas & Electric* is inapposite. That case considered the question whether

section 6 prevented FERC from issuing licenses that would indirectly encroach upon *other* existing projects. We expressly distinguished the situation presented here—"the *direct* threat of unilateral FERC" action to amend an existing license without the licensee's consent. *Pacific Gas & Elec.*, 720 F.2d at 89 n. 32 (emphasis added). And the Trust can draw no support from our speculation about the existence of a "'reasonableness' safeguard against a licensee's arbitrary refusal to consent," *id.* at 88, which was pure *dictum.*

The license article on which petitioner relies incorporates a 1980 settlement agreement with the National Wildlife Federation. That agreement requires Central to implement wildlife protective conditions contained in "new licenses." We owe deference to the Commission's interpretation of the hydroelectric licenses it issues and oversees, *see City of Seattle*, 883 F.2d at 1087, and think that the Commission reasonably interpreted the language in question to refer to new long-term licenses rather than to interim annual licenses. *See* 52 F.E.R.C. ¶ 61,339, at 62,346.

▮ We turn then, to the ESA claim, which the Trust characterizes as its best argument. Section 7 of the ESA, 16 U.S.C. § 1536, sets forth the obligations of federal agencies such as FERC to cooperate with the Secretary of the Interior in carrying out the directives of the Act. Subsection 7(a)(2) states, in relevant part:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action *authorized,* funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species

---

**2.** We also do not think the Commission was obligated to consult *formally* with the Fish and Wildlife Service in connection with the annual licenses. The Trust argues that this was required under section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2). It will be recalled that the Commission did consult informally with FWS—and largely did adopt FWS' recommendations. Petitioner has not demon-

strated how a more formal consultation would have resulted in any change in FERC's position. In any event, we think the consultation engaged in here was consistent with our directive in *Platte River I* for "rough and ready" measures. The Commission has indicated that it will soon initiate formal consultation in connection with the pending relicensing proceedings.

or result in the destruction or adverse modification of habitat of such species which is determined ... to be critical. *Id.* § 1536(a)(2) (emphasis added). And subsection 7(a)(1) provides that agencies "shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of [the ESA]." *Id.* § 1536(a)(1).

The Trust reads section 7 essentially to oblige the Commission to do "whatever it takes" to protect the threatened and endangered species that inhabit the Platte River basin; any limitations on FERC's authority contained in the FPA are implicitly superseded by this general command. Petitioner relies on *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (*TVA*), the famous "snail darter" case in which the Supreme Court said that section 7's legislative history "reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species." *Id.* at 185, 98 S.Ct. at 2297. We think the Trust's interpretation of the ESA is far-fetched. As the Commission explained, the statute directs agencies to "utilize their authorities" to carry out the ESA's objectives; it does not *expand* the powers conferred on an agency by its enabling act. *See Order on Rehearing* at 61,752–53. *TVA*, which did not even consider whether section 7 allows agencies to go beyond their statutory authority to carry out the purposes of the ESA, is hardly authority to the contrary. *See id.* at 61,752 n. 113. Accordingly, we deny the Trust's petition for review.

### B.

■ The conservation groups and environmental agencies recommended that FERC prohibit the Districts from entering new irrigation contracts prior to long-term relicensing in order to ensure that a sufficient supply of water remained available for any interim wildlife protective conditions the Commission decided to impose. The Commission concluded that this was unnecessary because "[s]o long as recommended minimum flows are maintained, any loss of water to future irrigation contracts would not adversely affect threatened or endangered species." *Interim License Conditions Order* at 61,541. On rehearing, the conservation groups pointed out that Article 400 does not require flow releases for wildlife protection if water storage levels decline below a certain point; by entering new irrigation contracts, they suggested, the Districts could evade the minimum flow conditions entirely. To this the Commission responded that it had no evidence that either Central or NPPD would enter new contracts before relicensing, and it observed that the possibility seemed remote given the Districts' position that their water supplies are already threatened by Article 400. *See Order on Rehearing* at 61,753.

The conservation groups maintain that this decision is arbitrary and capricious because it rests on self-serving representations by the Districts and conflicts with the view of the expert environmental agencies that habitat will further degrade if the Districts enter additional irrigation contracts. They also claim that the decision violates 16 U.S.C. § 803(j), which provides in part that wildlife protective conditions contained in licenses issued under the FPA "shall be based on recommendations received ... from the National Marine Fisheries Service, the United States Fish and Wildlife Service, and State fish and wildlife agencies." *Id.* § 803(j)(1).

■ The conservation groups did not raise the section 803(j) claim in their petition for rehearing; we lack jurisdiction to address it. We thought we had made clear in *Platte River I* that under the FPA's judicial review provision, 16 U.S.C. § 825*l* (b), "[p]arties seeking review of FERC orders must petition for rehearing of those orders and must themselves raise in that petition all of the objections urged on appeal." *Platte River I*, 876 F.2d at 113 (emphasis omitted) (citing *ASARCO, Inc. v. FERC*, 777 F.2d 764, 774 (D.C.Cir.1985)); *accord Town of Norwood v. FERC*, 906 F.2d 772, 774 (D.C.Cir.1990). "Neither FERC nor this court has authority to waive

these statutory requirements." [3] *Platte River I,* 876 F.2d at 113. And in our view, the decision not to bar future irrigation contracts is not arbitrary and capricious. There is no record evidence that the Districts have or plan to enter new contracts, and thus we do not think the Commission acted unreasonably by declining to impose a cap at this time. Because the Commission gave a reasoned explanation for its decision, the conservation groups' petition for review is also denied.

### III.

The Districts, attacking FERC from the other direction, claim that the *Interim License Conditions Order* is based on insufficient evidence. They argue that *Platte River I* authorized only interim conditions designed to prevent irreversible environmental damage in the period before relicensing and that the record does not support the Commission's conclusion that temporary emergency conditions were necessary here. The Districts further object to the procedures the Commission used, and they contend that the decision to impose certain conditions only on NPPD was arbitrary and capricious. Finally, they claim that the Commission violated FPA sections 4(e) and 10(a) because it failed adequately to consider the impact of the proposed conditions on irrigation and recreation. Some of the Districts' claims are not justiciable, and we are unpersuaded by the others.

 The environmental petitioners challenge Central's standing to object to the *Interim License Conditions Order* on the ground that Central is not aggrieved. It is axiomatic that Article III and the APA require a party challenging an administrative order to show injury in fact. *See, e.g., Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972). "[T]he alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990) (quoting *Los Angeles v. Lyons,* 461 U.S. 95,

101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)); *accord Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 715 (D.C.Cir.1977). Central concedes that it is currently suffering no hardship as a result of the Commission's order but maintains that it still has standing because it *would* become aggrieved if we granted the Trust's petition and directed FERC to impose conditions on Central. Allegations of injury based on predictions regarding future legal proceedings are, however, "too speculative to invoke the jurisdiction of an Art[icle] III Court." *Whitmore,* 495 U.S. at 157, 110 S.Ct. at 1724. Because Central has demonstrated no current or even impending injury, we agree with the environmental petitioners that Central lacks standing to petition for review of the Commission's order.

 It is also argued that the *Stay Order* has rendered NPPD's challenge to the *Interim License Conditions Order* unripe for review. With respect to those claims that relate to the minimum flow regime, the only part of the order that was stayed, we agree. *Cf. Occidental Chem. Corp. v. FERC,* 869 F.2d 127 (2d Cir.1989) (holding that a FERC order stayed pending completion of related rulemaking proceedings was unripe for review). A stay of a district court judgment or agency order pending appellate court review, *see* FED. R.APP.P. 8(a); *id.* 18, does not, of course, render an otherwise final decision unripe. But the *Stay Order* in this case—which is indefinite in duration—is, we think, of a different nature. There is no indication that the Commission will lift the stay before NPPD receives a long-term license, and even if it does, it may well modify the *Interim License Conditions Order* to take account of a license amendment recently accepted by Central that sets forth target flows providing some protection for wildlife (albeit less than was called for under the original Article 400). *See Central Nebraska Public Power and Irrigation District, Project No. 1417–032,* 56 F.E.R.C. ¶ 61,059, at 61,229–31, *reh'g denied,* 57 F.E.R.C.

---

**3.** The statute recognizes an exception when the failure to preserve an issue in an application for rehearing is based on "reasonable ground[s]."

16 U.S.C. § 825*l*(b). No one argues that the exception applies here.

¶ 61,175 (1991). We are thus presented with a situation in which " 'further administrative action is needed to clarify the agency's position,' or ... resolution of the dispute is likely to prove unnecessary." *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir.1986), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987) (quoting *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 940 (D.C.Cir.1986)). Postponing judicial review until the Commission's position is clearer will not cause NPPD hardship, moreover, because NPPD has no current obligation to release minimum flows. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1967). Accordingly, we do not reach the arguments that the minimum flow requirements are unsupported by substantial evidence and that there is no interim threat to whooping cranes or bald eagles, for which the minimum flows were adopted. Nor do we address the claim that the Commission violated the FPA by failing to consider irrigation and recreational interests, because that claim, as NPPD presented it, is relevant only to the minimum flows.

▆ The maximum flows mandated by Article 400, which the Commission found were necessary to provide dry nesting sites for least terns and piping plovers, were not stayed, however, and therefore NPPD's challenge to this condition is ripe. NPPD also remains subject to Article 401, which requires the development of tern and plover nesting sites. *See Interim License Conditions Order* at 61,536–38, 61;542; *Order on Rehearing* at 61,753. On the merits, we do not think these two conditions are unreasonable. (Indeed, NPPD has admitted as much with respect to the maximum flows; it says the projects will never release anything close to the amounts of water prescribed.) NPPD challenges FERC's conclusion that the projects' operation threatens irreversible harm to the terns and plovers by contributing to channel narrowing and increased vegetation, which forces the birds to nest at lower elevations where they are vulnerable to flooding. NPPD concedes the possibility of nest inundation but contends there is no evidence that flooding—a natural occurrence—creates a potential for irreversible damage. The Commission, however, adopted the Fish and Wildlife Service's determination that "loss of suitable habitat caused by project operation [makes] tern and plover nests especially *vulnerable* to inundation." *Order on Rehearing* at 61,-746 (emphasis added); *Interim License Conditions Order* at 61,538. It noted that "[i]n 1989 all known plover and least tern nests on the Platte River were eliminated by inundation." *Id.* Even if, as the Districts maintain, the tern and plover populations are increasing, FERC's conclusion that incidents of flooding prior to relicensing could seriously impede the species' recovery, and thereby cause them irreversible harm, does not seem to us unwarranted.

▆ NPPD further claims that the Commission should not have imposed conditions on NPPD alone without first determining the extent to which it, rather than Central, was responsible for the alleged harms. But Article 400 specifically provides for modification "if required by flood conditions beyond the licensee's control." *See supra* note 1. And nothing in *Platte River I* obligates the Commission to allocate blame between Central and NPPD; nor does the FPA appear to impose such a requirement.

▆ NPPD briefly criticizes the procedures the Commission used in this case. It contends that the Commission "unquestioningly accept[ed]" the conditions proposed by the Trust, conservation groups, and environmental agencies without making "*any* independent examination of the record" (emphasis in original). The record tells a different story. FERC conducted an eight-month inquiry into the need for interim wildlife protective conditions, during which it sought recommendations and received submissions from the Districts as well as the Trust, conservation groups, and environmental agencies. Commission staff visited the project sites in the company of the interested parties. The *Interim License Conditions Order* is based on a 10,000–page record, and when the Commission rejected conclusions suggested by the Districts' submissions, it explained why. *See, e.g., Interim License Conditions Order* at

61,534, 61,539; *Order on Rehearing* at 61,-745–47. We are satisfied that in this instance the Commission has engaged in reasoned decisionmaking.[4] *See United States Dep't of Interior v. FERC,* 952 F.2d 538, 543 (D.C.Cir.1992).

\* \* \* \* \* \*

The parties informed us at oral argument that the relicensing of Central and NPPD is well underway; according to the Commission, new long-term licenses could issue in one to one-and-a-half years. Why the parties have continued so hotly to contest the provisions of the temporary annual licenses—some of which are not currently in effect and all of which promise soon to become obsolete—remains something of a mystery to us. Nonetheless, we are presented with what is, for now, at least in part, a live controversy, and, for the foregoing reasons, we deny all of the petitions for review. We hold that the Commission has properly declined unilaterally to impose the conditions approved in the *Interim License Conditions Order* on Central. We also hold that the Commission did not err by refusing to bar the Districts from entering new irrigation contracts absent any evidence that the Districts planned to do so. NPPD remains obligated to comply with the maximum flow scheme and with Article 401; it will be free to challenge the minimum flow requirements if and when the *Stay Order* is lifted and those requirements are reimposed upon it.

*It is so ordered.*

---

4. We do not reach a separate argument made by intervenor the State of Wyoming that the Commission improperly denied the Districts' request for an evidentiary hearing. The Districts do not assert this specific claim before us. Absent extraordinary circumstances not present here, *see Lamprecht v. FCC,* 958 F.2d 382, 389 (D.C.Cir. 1992) (citing *Synovus Fin. Corp. v. Board of Governors,* 952 F.2d 426, 431–34 (D.C.Cir.1991)), we have held that intervenors "'may only join issue on a matter that has been brought before the court by another party.'" *Id.* (quoting *Illinois Bell Tel. v. FCC,* 911 F.2d 776, 786 (D.C.Cir. 1990)). Even assuming that the matter of an evidentiary hearing is before us by virtue of the Districts' other procedural claims, we would lack jurisdiction to respond to Wyoming because it filed no petition for rehearing. As explained in Part II above, parties seeking review of FERC orders must petition for rehearing and must themselves raise the objections urged on appeal.

For the same reasons we do not consider a constitutional takings claim presented by intervenor Nebraska Water Users, Inc. (NWU), which, we are told, was formed to represent the interests of water users in Nebraska who have contracted with the Districts for water resources. No other party has raised this argument before us, and it was not preserved in NWU's petition for rehearing.