**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEFENDERS OF WILDLIFE;
CENTER FOR BIOLOGICAL DIVERSITY;
CRAIG MILLER,
                        *Petitioners,*

                v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
                        *Respondent,*

NATIONAL ASSOCIATION OF HOME
BUILDERS; STATE OF ARIZONA;
ARIZONA CHAMBER OF COMMERCE,
                        *Intervenors.*

No. 03-71439

EPA No.
67-Reg. 79629

DEFENDERS OF WILDLIFE;
CENTER FOR BIOLOGICAL DIVERSITY;
CRAIG MILLER,
                        *Petitioners,*

                v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; ROBERT B.
FLOWERS,
                        *Respondents.*

No. 03-72894

No. CV-02-
01195-CKJ

ORDER

Filed June 8, 2006

Before: Stephen Reinhardt, David R. Thompson, and
Marsha S. Berzon, Circuit Judges.

Order;
Dissent by Judge Kozinski;
Dissent by Judge Kleinfeld;
Concurrence by Judge Berzon;

## ORDER

The panel has voted to deny the petition for panel rehearing. The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc. Fed. R. App. P. 35. The request for panel rehearing and rehearing en banc is DENIED. Judge Kozinski's and Judge Kleinfeld's dissents from denial of en banc rehearing, and Judge Berzon's concurrence in denial of en banc rehearing, are filed concurrently herewith.

KOZINSKI, Circuit Judge, with whom Judges O'SCANNLAIN, KLEINFELD, TALLMAN, CALLAHAN and BEA join, dissenting from denial of rehearing en banc:

Less than two years ago, the Supreme Court unanimously reversed our interpretation of the National Environmental Policy Act (NEPA). *See Dep't of Transp.* v. *Pub. Citizen*, 541 U.S. 752 (2004). Tone-deaf to the Supreme Court's message, the panel majority in this case interprets the Endangered Species Act (ESA) in precisely the same incorrect way we interpreted NEPA, dramatically expanding agencies' obligations under the law. Along the way, the majority tramples all over the Fish and Wildlife Service's (FWS) reasonable interpretation of the ESA, deliberately creates a square inter-circuit conflict with the Fifth and D.C. Circuits, and ignores at least six prior opinions of our own court. Finally, the decision is

one of considerable importance to the federal government and the states of our circuit. This is precisely the kind of case we should take en banc to set our own house in order.

## Background

The Clean Water Act (CWA) instructs that the Environmental Protection Agency (EPA) "shall" transfer pollution permitting authority to a state if the state's proposal meets nine criteria. *See* 33 U.S.C. § 1342(b). None of the criteria involves consideration of endangered species. Arizona applied to take over the CWA permitting process within its borders—the forty-fifth state to do so. There is no dispute that its proposal met all nine criteria listed in the CWA.

The EPA regional office in San Francisco, however, was worried that the transfer might affect endangered species. *See* 16 U.S.C. § 1536(a)(2) (section 7(a)(2) of the ESA) (requiring federal agencies to "insure" that their actions do not jeopardize endangered species). It thus initiated consultation with FWS pursuant to ESA section 7. The regional office also stated publicly that section 7 required EPA to take endangered species into account when making a transfer decision. FWS's local office in Arizona similarly expressed concerns about the transfer.

Next, the matter was "elevated," meaning the national offices of EPA and FWS took over. After national-level discussions, FWS reversed course, recommending immediate approval of the transfer. That agency issued a Biological Opinion (BiOp) concluding that any impact of the transfer on endangered species would be the unavoidable result of (1) Congress's decision to make ESA section 7 inapplicable to the states, and (2) Congress's decision to *require* transferring the permitting process to the states, provided the nine criteria were met (none of which included consideration of endangered species). Thus, under FWS's interpretation, the ESA was inapplicable: EPA's decision to grant the transfer could

not "cause" any impact on endangered species because the decision was non-discretionary. Two days after receiving FWS's recommendation, EPA approved the transfer.

## Discussion

In striking down EPA's transfer approval, the majority makes five fundamental blunders: First, it mistakes EPA's internal deliberations for analytical inconsistency. Second, the majority fails to give appropriate deference to FWS's interpretation of the ESA. Third, the majority treats the ESA as superior to all other laws, thereby nullifying a crucial ESA regulation and forcing agencies to violate their governing statutes. Fourth, the majority contradicts the Supreme Court's recent pronouncement in *Public Citizen*. Finally, the majority dismisses the reasoned opinions of two other circuits, creating a square conflict.

**1.** The majority first finds that EPA's decisionmaking process was internally inconsistent. *See Defenders of Wildlife*, 420 F.3d at 959-62. On the one hand, EPA stated several times that the ESA required it to consider endangered species before approving the transfer. On the other hand, the agency concluded it had no discretion under the CWA to take endangered species into account when making the transfer decision. Thus, the majority finds, EPA's decision "cannot stand." *Id.* at 962.

The majority makes a big fuss over the supposed internal inconsistency in EPA's reasoning, but the so-called problem is of the panel's own making. The only "inconsistency" is between the San Francisco regional office's interpretation of the ESA and the interpretation by EPA headquarters in Washington, D.C. In other words, EPA changed its mind upon further reflection at a higher level. The agency's position is that adopted by EPA at the national level; the position taken by the agency's regional office was simply overruled by the national office in Washington. There is no inconsistency in

the agency's final action, which is the only one we are entitled to review. *See* 5 U.S.C. § 704.

The majority also points out that EPA's final action in this case was inconsistent with the actions it has taken when other states have applied for a transfer. *See Defenders of Wildlife*, 420 F.3d at 952 n.3 (noting that all of EPA's transfer decisions since 1993—six besides Arizona—have taken endangered species into account, whereas none before 1993 did). But there is no indication that EPA's deliberations in the other cases were ever elevated to the national level. As far as we know, this is the only case in which EPA's Washington, D.C. office has opined on the applicability of the ESA to the transfer of the CWA permitting process. Moreover, an agency is not locked into a particular position forever; it is entitled to change its view over time. *See Mesa Verde Constr. Co.* v. *N. Cal. Dist. Council of Laborers*, 861 F.2d 1124, 1130 (9th Cir. 1988) (en banc). EPA's actions in other cases are irrelevant to whether its analysis was internally inconsistent in this one.

In any event, the majority's finding of an inconsistency in EPA's analysis, if correct, should have been the end of the case; the majority should have remanded to EPA for further clarification, as the agency asked the panel to do. *See Defenders of Wildlife*, 420 F.3d at 969 n.19. Even the majority itself says it "must remand" to EPA for clarification. *See id.* at 962. Instead, it embarks on a 17-page boondoggle, conducting the very analysis that EPA should have had an opportunity to conduct for itself. *See Gonzales* v. *Thomas*, 126 S. Ct. 1613, 1614 (2006) ("The Ninth Circuit's failure to remand is legally erroneous, and that error is 'obvious in light of *Ventura*,' itself a summary reversal.").

**2.** In faulting EPA for its alleged internal inconsistencies, the majority misconstrues the way the ESA was meant to operate. Under the ESA, a federal agency must consider whether its action "may affect" endangered species. 50 C.F.R. § 402.14(a). If the agency thinks endangered species *might* be

affected, it must ask FWS whether its supposition is correct—whether its action *would*, in fact, affect endangered species—and, if so, what the impact on endangered species will be. *See id.*; *id.* §§ 402.14(e), (h). Then, FWS must respond by issuing a BiOp that the agency must take into account before making its decision. *See id.* §§ 402.14(e), 402.15(a).

In this case, EPA was initially concerned that its approval of Arizona's transfer application might affect endangered species. EPA does not administer the ESA, so it doesn't have the expertise to know for sure. *See Am. Forest & Paper Ass'n* v. *EPA*, 137 F.3d 291, 297 (5th Cir. 1998). In order to find out whether its transfer approval *would*, in fact, affect endangered species, EPA did exactly what it was supposed to do: It asked FWS, the agency that *is* charged with administering the ESA. *See United States* v. *McKittrick*, 142 F.3d 1170, 1174 (9th Cir. 1998). And FWS did exactly what *it* was supposed to do: It responded with a BiOp informing EPA that its approval would not, in fact, affect endangered species. *See* p. 6289 *supra*. With this advice from the congressionally designated experts in hand, EPA decided that its initial concerns were unfounded and that it could go forward with the transfer approval.

The majority finds this perfectly logical sequence of events to be "nonsensical" and impermissible. *See Defenders of Wildlife*, 420 F.3d at 961. According to the majority, once EPA expressed concern that its action might affect endangered species, it had already conclusively determined that its decision was governed by the ESA. *See id.* In other words, under the majority's interpretation, once FWS is consulted for guidance, it is precluded from ever determining that the ESA is inapplicable.

With all due respect to my colleagues, it is *their* conclusion that is nonsensical, undermining the entire consultative process that the ESA establishes and striking down FWS's perfectly reasonable interpretation of the ESA. The majority

forgets that FWS is the agency charged with administering the ESA, and that its interpretation of the ESA is thus entitled to *Chevron* deference. *See Babbitt* v. *Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 703 (1995) (citing *Chevron U.S.A. Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Here, FWS determined—after careful study at the local and national levels—that the ESA was inapplicable to EPA's decision, and it issued a BiOp relaying its conclusion to the EPA. The majority cannot overturn FWS's statutory interpretation simply because it disagrees with it.

**3.** Having decided to conduct—on its own—the very analysis that FWS already conducted, the majority comes out the other way, getting it flatly wrong. The majority concludes that section 7 of the ESA required EPA to take endangered species into account when making the transfer decision, notwithstanding the plain contrary language of the CWA. It thus transformed the ESA into an overriding mandate that trumps an agency's obligations under its own governing statute. *See Defenders of Wildlife*, 420 F.3d at 963-67.

Further, the majority handily disposes of a regulation issued by FWS that was supposed to limit ESA's applicability to "actions in which there is *discretionary* Federal involvement or control." 50 C.F.R. § 402.03 (emphasis added). Unable to reconcile this regulation with its newly expansive interpretation of the ESA's mandate, the majority simply finds that the word "discretionary" in the regulation is meaningless; the regulation, announces the majority, is "coterminous" with the statute it interprets. *See Defenders of Wildlife*, 420 F.3d at 967-69. In other words, despite FWS's regulation, the majority finds that the ESA applies to anything "authorized, funded, or carried out" by a federal agency, 16 U.S.C. § 1536(a)(2), whether discretionary or not. Again, the majority fails to give FWS the deference it is due.[1]

---

[1]The majority points out that "§ 402.03 is a regulation, *not* a statute," *Defenders of Wildlife*, 420 F.3d at 969 n.19, as if that somehow robs its

In his dissent, Judge Thompson succinctly identifies the serious flaws in the majority's analysis. He points out that EPA had no authority under the CWA to consider endangered species when making the transfer decision. And he explains that the majority's interpretation of the scope of ESA's applicability contradicts our precedents: "[W]e have consistently recognized that an agency may have decisionmaking authority and yet not be empowered . . . to act to protect endangered species." *Defenders of Wildlife*, 420 F.3d at 979-80 (Thompson, J., dissenting) (citing six Ninth Circuit precedents that contradict the majority's holding). Once the nine criteria were met, the dissent concludes, the CWA mandated the transfer; nothing in ESA section 7 allows—let alone requires—the EPA to ignore the clear language of the CWA. *See id.* at 980-81.[2]

**4.** The majority's superfluous holding—that ESA forces an agency to consider the impact of its decisions on endangered species, even when the agency's governing statute precludes it from doing so—also flies in the face of *Public Citizen*, where the Supreme Court unanimously reversed our interpretation of NEPA. *See* 541 U.S. at 770, 773.

The issue in *Public Citizen* was whether NEPA "require[s] the Federal Motor Carrier Safety Administration (FMCSA) to

interpretation of deference. But FWS issued the regulation in question. *See id.* at 951 n.1. Its interpretation of the regulation is therefore also entitled to "substantial deference." *Martin* v. *Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150 (1991) (internal quotation marks omitted).

[2]We cannot presume that Congress repealed the CWA's categorical mandate sub silentio, simply by passing the ESA. *See* n.4 *infra*. But even if we were inclined to believe, as the panel majority does, that the CWA and ESA need to be reconciled, FWS's regulation is a perfectly plausible way to do so: By limiting the ESA's applicability to "discretionary" agency actions, 50 C.F.R. § 402.03, the regulation avoids the supposed conflict the majority has created between the ESA and governing statutes —like the CWA—that mandate agency action.

evaluate the environmental effects of cross-border operations of Mexican-domiciled motor carriers" before deciding whether to grant registration to Mexican trucks. *Id.* at 756. NEPA's language, regarding when and how an agency must take into account the impact of its actions on the environment, is similar to ESA's language regarding endangered species. *Compare* 42 U.S.C. § 4332(2)(C) *and* 40 C.F.R. § 1508.18, *with* 16 U.S.C. § 1536(a)(2) *and* 50 C.F.R. § 402.03. And the FMCSA's governing statute, like the CWA, instructs that the agency "shall" grant registration to any carrier meeting certain criteria, none of which involves environmental concerns. *See* 49 U.S.C. § 13902(a)(1).

In upholding the agency's decision to grant registration without taking into account the environmental impact of Mexican trucks, the Supreme Court stressed that "FMCSA has only limited discretion regarding motor vehicle carrier registration: It must grant registration to all domestic or foreign motor carriers that are willing and able to comply with the applicable . . . requirements. FMCSA has no statutory authority to impose or enforce emissions controls or to establish environmental requirements unrelated to motor carrier safety." *Id.* at 758-59 (internal quotation marks and citation omitted). The Supreme Court concluded that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect.[3] Hence, under NEPA . . . the agency need not consider these effects . . . . [B]ecause FMCSA has no discretion to prevent the entry of Mexican trucks, [it] did not need to consider the environmental effects arising from the entry." *Public Citizen*, 541 U.S. at 770.

---

[3]The majority quotes this sentence verbatim from *Public Citizen*. *Defenders of Wildlife*, 420 F.3d at 963. But, instead of recognizing that this language controls the case, the majority uses it as a springboard to launch into its unnecessary analysis.

The Supreme Court's holding in *Public Citizen* applies equally to this case: Because EPA had no discretion under the CWA to prevent the transfer of permitting authority to Arizona, it did not need to consider the transfer's effects on endangered species. The majority's contrary conclusion cannot be reconciled with the Supreme Court's unanimous decision.[4]

---

[4]Judge Berzon's concurrence dismisses *Public Citizen* as "entirely uninformative," concurrence at 6308, by labeling NEPA as a "strictly procedural statute" and the ESA as a "partially substantive statute," *id.* at 6307. What Judge Berzon must be arguing is that the ESA effected a sub silentio repeal of EPA's categorical obligation under the CWA, so that the statutory "shall" was foreshortened to "may." There is absolutely no indication that Congress meant to do any such thing and we should long hesitate before concluding that it did this unknowingly. *See Watt* v. *Alaska*, 451 U.S. 259, 267 (1981) (noting the maxim of statutory interpretation that "repeals by implication are not favored," and stating that "[t]he intention of the legislature to repeal must be clear and manifest" (internal quotation marks omitted)); *id.* at 280 (Stewart, J., dissenting) ("The maxim that 'repeals by implication are disfavored' has force when the argument is made that a general statute . . . eviscerates an earlier and more specific enactment of limited coverage but without an indication of congressional intent to do so."); *see also Ex parte Yerger*, 8 Wall. 85, 105 (1869) ("Repeals by implication are not favored. They are seldom admitted except on the ground of repugnancy; and never, we think, when the former act can stand together with the new act.").

If the ESA were as powerful as the majority contends, it would modify not only EPA's obligation under the CWA, but *every* categorical mandate applicable to *every* federal agency. We should be particularly chary of holding that the ESA made such sweeping changes when the agency charged with implementing the statute has adopted a regulation allowing the ESA to coexist peacefully with all categorical mandates. *See* 50 C.F.R. § 402.03; n.2 *supra*. There is no justification for nullifying countless congressional directives by casting aside the agency's authoritative interpretation of the ESA, formally adopted pursuant to notice and comment procedures.

Unless one buys into the dubious proposition that Congress somehow repealed the term "shall" in 33 U.S.C. § 1342(b), this case is a carbon copy of *Public Citizen*. "Shall" means shall here as it did there; thus EPA has no discretion to deny the transfer once the nine statutory criteria are satisfied. *See* Kleinfeld dissent at 6300. Just as in *Public Citizen*, the agen-

**5.** Finally, the majority opinion squarely, and admittedly, conflicts with the Fifth and D.C. Circuits. *See Defenders of Wildlife*, 420 F.3d at 970. In *American Forest & Paper Ass'n* v. *EPA*, the Fifth Circuit considered precisely the same question at issue in this case: whether the ESA imposes its own criteria on EPA's decision to transfer CWA permitting authority to a state—in that case, Louisiana—or whether the nine factors enumerated in the CWA are, as the plain text of the statute requires, an exhaustive list that precludes consideration of endangered species. *See* 137 F.3d 291, 297-99 (5th Cir. 1998).

In *American Forest*, unlike in this case, the EPA *wanted* to condition the transfer of the permitting process on protection of endangered species. But the Fifth Circuit determined—in direct contradiction to the majority here—that "[t]he [CWA's] plain language directs EPA to approve proposed state programs that meet the enumerated criteria; particularly in light of the command 'shall approve,' [the CWA] cannot be construed to allow EPA to expand the list of permitting requirements" to include consideration of endangered species. *Id.* at 298. Further, when EPA argued that the ESA compelled it to consider endangered species, the Fifth Circuit interpreted section 7(a)(2) of the ESA to mean exactly the opposite of the majority's holding:

> [I]f EPA lacks the power to add additional criteria to CWA § 402(b), nothing in the ESA grants the

cy's action—granting the transfer—is not a legally relevant "cause" of any impact on endangered species because the agency had no discretion in the matter once the statutory criteria were met. *See* 541 U.S. at 769.

When we are confronted with a question of statutory interpretation, we must take into account the Supreme Court's previous interpretation of highly similar words in an analogous situation, even if the two cases are not "identical." Concurrence at 6305. It is no doubt symptomatic of my "myopic" view of the world, *id.* at 6307, but I believe we should treat Supreme Court pronouncements as binding, not as mere hazards to navigation.

agency the authority to do so. Section 7 of the ESA
. . . confers no substantive powers.

. . . [T]he ESA serves not as a font of new authority,
but as something far more modest: a directive to
agencies to channel their *existing* authority in a par-
ticular direction. *The upshot is that EPA cannot
invoke the ESA as a means of creating and imposing
requirements that are not authorized by the CWA.*

*Id.* at 298-99 (second emphasis added) (footnote omitted). In
recognition of the circuit split it is creating, the majority dis-
misses the Fifth Circuit's reasoning out of hand, calling it a
"fundamental misconception" and "simply incorrect."
*Defenders of Wildlife*, 420 F.3d at 971.

The D.C. Circuit has also considered the ESA's power to
override the mandate of an agency's governing statute. *See
Platte River Whooping Crane Critical Habitat Maint. Trust* v.
*FERC*, 962 F.2d 27, 32-33 (D.C. Cir. 1992). Under the Fed-
eral Power Act, the Federal Energy Regulatory Commission
(FERC) was precluded from amending the annual licenses it
gave to a hydroelectric plant, and thus could not insert wild-
life protective conditions into the license upon renewal. *See
id.* at 32. Petitioners alleged, however, that notwithstanding
the Federal Power Act, section 7 of the ESA required FERC
to impose such conditions on the licensee. *See id.* at 33. The
D.C. Circuit disagreed:

The Trust reads section 7 essentially to oblige the
Commission to do "whatever it takes" to protect the
threatened and endangered species that inhabit the
Platte River basin; any limitations on FERC's
authority contained in the [Federal Power Act] are
implicitly superseded by this general command. . . .
We think the Trust's interpretation of the ESA is far-
fetched. As the Commission explained, the statute
directs agencies to "utilize their authorities" to carry

out the ESA's objectives; it does not *expand* the powers conferred on an agency by its enabling act.

*Id.* at 34. Like the Fifth Circuit, the D.C. Circuit's interpretation of the ESA directly contradicts the majority's holding in this case. But again, the majority dismisses its sister circuit's reasoning as "cursory" and unpersuasive. *Defenders of Wildlife*, 420 F.3d at 971.[5]

\* \* \*

The majority's opinion has far-reaching effects on the scope of the Endangered Species Act. Its holding—that the ESA imposes an affirmative duty on a federal agency to protect endangered species, even in the face of a governing statute that explicitly precludes the agency from doing so—contradicts FWS's statutory interpretation, ignores the very recent instructions of the Supreme Court, and creates a conflict with two other circuits. And for what? All EPA asks for is to have an opportunity to clarify its position on the issue, and explain why its decision to transfer permitting authority

---

[5]The majority concedes the conflict with the Fifth and D.C. Circuits but claims it is merely taking sides in a preexisting conflict, because the First and Eighth Circuits have issued opinions agreeing with its position. *See id.* at 970-71 (citing *Conservation Law Found.* v. *Andrus*, 623 F.2d 712 (1st Cir. 1979), and *Defenders of Wildlife* v. *EPA*, 882 F.2d 1294 (8th Cir. 1989)). The First and Eighth Circuit cases, however, do not support the majority's position. Both cases addressed situations where the governing statute and the ESA were complementary, not where the governing statute *precluded* consideration of endangered species as the CWA does. *See Andrus*, 623 F.2d at 715 ("[T]he assumption that the ESA and OCSLA are mutually exclusive . . . is incorrect—the standards of these two acts are complementary, and the ESA will continue to apply of its own force . . . ."); *Defenders of Wildlife*, 882 F.2d at 1299 ("FIFRA does not exempt the EPA from complying with ESA requirements when the EPA registers pesticides."). Neither circuit held, as the majority in this case does, that the ESA trumps the governing statute, or that the ESA applies when the governing statute precludes agency discretion regarding endangered species. The inter-circuit conflict is entirely of the panel's own making.

to Arizona made sense. Even more recent Supreme Court instructions emphatically command us to do just that. *See Thomas*, 126 S. Ct. at 1614-15. The majority's stubborn refusal to give the agency that opportunity before vacating its transfer decision has put us in a highly precarious position vis-à-vis the executive branch, the states, the other circuits and the Supreme Court. We should have taken the case en banc and fixed the problems ourselves.

---

KLEINFELD, Circuit Judge, dissenting from denial of rehearing en banc:

I join in Judge Kozinski's thorough dissent, but write separately to show just how simple this case should have been. As Judge Thompson pointed out in his dissent from the panel's decision, the statute is mandatory. Congress commands that the agency "shall approve" state programs "unless" one or more of nine conditions are not met. The "shall/unless" formula makes the nine condition list exclusive, and courts cannot add conditions to the list.[1] The language has the look of a careful legislative compromise necessary to get the votes for passage.[2] The statute leaves no room for conditions ten, eleven, or whatever else we may think Congress should have added.[3]

---

[1]*See*, e.g., *Department of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2005).

[2]*Cf. Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1113 (9th Cir. 2000) ("Legislation often results from a delicate compromise among competing interests and concerns. If we were to 'fully effectuate' what we take to be the underlying policy of the legislation, without careful attention to the qualifying words in the statute, then we would be overturning the nuanced compromise in the legislation, and substituting our own cruder, less responsive mandate for the law that was actually passed.").

[3]*Cf. Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1312-13 (9th Cir. 1992).

BERZON, Circuit Judge, concurring in the order denying the petition for rehearing en banc:

## I.

I begin by explaining why I am writing this concurrence: A practice has developed in this court of writing dissents from denial of rehearing en banc consideration as a matter of routine. Those dissents sometimes read more like petitions for writ of certiorari than judicial opinions of any stripe. They pose a dilemma for those who believe the original opinion correct, as they may raise issues not addressed by that opinion because not articulated by the parties before the petition for rehearing stage—or ever.

The result, absent some response, is a distorted presentation of the issues in the case, creating the impression of rampant error in the original panel opinion although a majority—often a decisive majority—of the active members of the court either perceived no error or thought the case not one of much consequence. At the same time, answering the newly raised contentions by amending the panel opinion is usually not feasible. The court has voted not to rehear en banc the original opinion and ought not to have to accept a new version without a second opportunity to determine whether the opinion deserves en banc consideration. The result, quite obviously, could be a form of infinite regression which precludes us from ever finally deciding the case.

In this case, Judge Kozinski writes an impassioned dissent from denial of en banc consideration, accusing the panel majority of all manner of judicial perfidy. The problem is that his accusations are either flat wrong or indicate a misunderstanding of the holdings in the panel opinion. As the author of the panel opinion, I have no choice but to try to set the record straight. So as to avoid establishing a new tradition of group *concurrences* in denial of en banc to match the group

dissents, I intentionally write for myself alone, without the concurrence of any of my colleagues.

## II.

The majority opinion in *Defenders of Wildlife v. EPA*, 420 F.3d 946 (9th Cir. 2005), if carefully read, contains responses to most of the baseless attacks that Judge Kozinski has dropped upon it. Among other errors in the dissent from denial of rehearing en banc that are exposed in the opinion are:

(1) the notion that the national Environmental Protection Agency (EPA) did not endorse in this case the position that the Endangered Species Act requires consultation with regard to Clean Water Act permitting decisions, Kozinski Dissent at 6290-91, when it did, *see Defenders of Wildlife*, 420 F.3d at 959-60;[1]

---

[1]Judge Kozinski insists that "[a]ll EPA asks for is to have an opportunity to clarify its position on the issue, and explain why its decision to transfer permitting authority to Arizona made sense." Kozinski Dissent at 6299-6300; *see also id.* at 6291. In fact, in its petition for rehearing en banc the EPA quarreled at length with the merits of the majority opinion, and, building upon Judge Thompson's dissent, asserted an intracircuit conflict. The possibility of a remand for clarification of the agency's interpretation of the statute is mentioned in a single footnote and only with regard to the portion of the opinion that discusses EPA's prior inconsistent positions (an inconsistency which, unlike Judge Kozinski, the EPA does not dispute).

Furthermore, Judge Kozinski's citation to *Gonzales v. Thomas*, 126 S. Ct. 1613 (2006) is inapposite. In *Thomas*, the Supreme Court faulted this court for not giving the agency an opportunity to decide an issue in the first instance. Here, in contrast, the EPA did decide that a transfer was appropriate and that it did not have the authority to consider the impact on endangered and threatened species of the transfer decision. We disagreed with both conclusions. Now, the EPA wants to decide the issue *again*, explaining its reasoning once more. *INS v. Ventura*, 537 U.S. 12 (2002), does not require that an agency have *two* chances to consider a factual or legal question before appellate review, only one. Further, the majority opinion ultimately *does* remand the transfer decision for consideration on proper legal grounds.

(2) the repeated assertion that section 401 of the Clean Water Act "precludes" application of the plain language of section 7 of the after-enacted Endangered Species Act, Kozinski Dissent at 6294, when the pertinent part of the Clean Water Act does not mention the Endangered Species Act at all, *see Defenders of Wildlife*, 420 F.3d at 963-69;

(3) the insistence that the Endangered Species Act does not apply to *any* action "authorized, funded, or carried out" by a federal agency, Kozinski Dissent at 6293, when that is exactly what section 7(a)(2) says, in a perfectly clear statutory requirement that may not be contravened by an interpretative regulation, *see Chevron U.S.A., Inc. v. Natural Res. Def. Counsel*, 476 U.S. 837, 842-43 & n.9 (1984); *Defenders of Wildlife*, 420 F.3d at 969;

(4) the allegation that there was not a preexisting circuit split, even though *Defenders of Wildlife v. EPA*, 882 F.2d 1294 (8th Cir. 1989), and *Conservation Law Foundation v. Andrus*, 623 F.2d 712 (1st Cir. 1979), held that agencies *do* have to comply with the Endangered Species Act *as well as* their own governing statutes, *see Defenders of Wildlife*, 420 F.3d at 970;

(5) the contention that the analysis contained in *Platte River Whooping Crane Critical Habitat Maintenance Trust v. Federal Energy Regulatory Commission*, 962 F.2d 27, 34 (D.C. Cir. 1992), and *American Forest & Paper Ass'n v. U.S. Environmental Protection Agency*, 137 F.3d 291, 293-94 (5th Cir. 1998), is more accurate than the analysis in *Defenders of Wildlife*, even though those cases rely on the language of section 7(a)(1) and disregard the quite different wording of section 7(a)(2), *see Defenders of Wildlife*, 420 F.3d at 970-71;

(6) the statement that *American Forest* decided precisely the same question addressed in *Defenders of Wildlife*, Kozinski Dissent at 6297, when the issue in that case was not what factors the EPA must consider in making the transfer decision

but whether the EPA must impose Endangered Species Act requirements on the states as a condition of transfer;

(7) the accusation that the panel opinion "ignor[ed] at least six prior opinions of our own court," Kozinski Dissent at 6288, when the panel opinion discusses and distinguishes those opinions at some length, *Defenders of Wildlife*, 420 F.3d at 967-69; and

(8) the assertion that the Fish and Wildlife Service's (FWS) position regarding the impact of the transfer is entitled to *Chevron* deference, Kozinski Dissent at 6293, even though that position required, in part, an interpretation of the Clean Water Act, over which the FWS has no regulatory power, 33 U.S.C. § 1251(d) (designating the Administrator of the EPA to "administer this chapter").[2]

---

[2]Judge Kozinski also insists that the majority opinion "presume[s] that Congress repealed the CWA's categorical mandate sub silentio, simply by passing the ESA." Kozinski Dissent at 6294 n.2. As the opinion makes clear, we do not see the Endangered Species Act as *repealing* any part of the Clean Water Act. Rather, the Endangered Species Act, a later-enacted statute, *adds* one requirement to the list of considerations under the Clean Water Act permitting transfer provision. The repeal accusation places entirely too much weight on the word "shall," supposing that it shuts out any and all additional federal requirements concerning federal decision-making.

Moreover, if the precept disfavoring repeals by implication does apply, the very definite, unqualified language of the after-enacted Endangered Species Act must still prevail. *See United Ass'n of Journeymen v. Reno*, 73 F.3d 1134, 1140 (D.C. Cir. 1996) (finding that a specific, detailed provision precludes operation of an earlier-enacted general statute that would otherwise apply); *id.* at 1142 (Edwards, J., dissenting) (noting that the specific provision did not mention the other provision or statute at issue in the case); *see also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 188 (1978) (noting that Congress expressly limited the Endangered Species Act's "broad sweep" in certain, enumerated situations, and because of such express limitations "we must presume that these were the only 'hardship cases' Congress intended to exempt").

There is, however, one point upon which Judge Kozinski places much stock—perhaps more than on any other—that is not addressed in the majority panel opinion. The reason for the lapse is not that Judge Kozinski is correct in his emphatic assertions regarding *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), but that he is so wrong that there was no reason we would have addressed his argument in the first instance.

### III.

Judge Kozinski boldly asserts that the panel opinion "flies in the face of *Public Citizen*." The assertion that the two cases are identical, even similar, misunderstands both *Public Citizen* and *Defenders of Wildlife* itself, while ignoring a Supreme Court case that *is* closely on point, *Tennessee Valley Authority v. Hill*, 434 U.S. 153 (1978).

The Endangered Species Act, at issue in *Defenders of Wildlife*, sets a substantive requirement that all agencies must follow. As *Tennessee Valley Authority* states, the Endangered Species Act "*affirmatively command*[*s*] all federal agencies 'to *insure* that actions *authorized, funded, or carried out* by them do not *jeopardize* the continued existence' of an endangered species." *Defenders of Wildlife*, 420 F.3d at 964 (quoting *Tenn. Valley Auth.*, 437 U.S. at 173).

*Public Citizen* concerned an entirely different environmental statute, the National Environmental Policy Act (NEPA). NEPA, in contrast to the Endangered Species Act, establishes only the requirement that environmental impact must be *considered* when making certain federal decisions. *See* 42 U.S.C. § 4332(2)(C) (requiring a statement of environmental impact for "major Federal actions" but requiring no federal response to any environmental impact demonstrated); *Public Citizen*, 541 U.S. at 756-57 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).

*Public Citizen* concerned a congressionally enacted morato-
rium prohibiting certain motor carriers from obtaining operat-
ing authority within the United States and authorizing the
President to lift the moratorium. *Id.* at 759. In 2002, the Presi-
dent lifted the moratorium with respect to Mexican motor
carriers. *Id.* at 762. The Federal Motor Carrier Safety Admin-
istration, the agency with authority to grant registration to for-
eign motor carriers, issued rules for monitoring Mexican
motor carriers. *Id.* Petitioners sued, claiming that the rules
were promulgated in violation of NEPA and the Clean Air
Act. *Id.*

The Supreme Court rejected petitioners' arguments. Perti-
nent here is the Court's discussion of NEPA, as that is the
portion of *Public Citizen* with which Judge Kozinski claims
*Defenders of Wildlife* is in conflict.[3] Critically for present pur-
poses, NEPA is a procedural statute *only*, *see id.* at 756; it
provides specific steps that must be taken before making deci-
sions with regard to major actions that the agency has author-
ity to undertake, but does not direct that environmental
considerations actually influence the action.[4] In contrast, the

---

[3]It is worth noting also that, as *Public Citizen* recognized, NEPA
requires an agency to provide an Environmental Impact Statement only "if
it will be undertaking a '*major* Federal actio[n],' which 'significantly
affect[s] the quality of the human environment.' " *Id.* at 763 (quoting 42
U.S.C. § 4332(2)(C)) (emphasis added). There is no requirement of a
"*major* Federal actio[n]" in the Endangered Species Act; any "action
authorized, funded, or carried out by the agency" will do. 16 U.S.C.
§ 1536(a)(2).

[4]42 U.S.C. 4332(2)(C) reads:

[A]ll agencies of the Federal Government shall . . . include in
every recommendation or report on proposals for legislation and
other major Federal actions significantly affecting the quality of
the human environment, a detailed statement by the responsible
official on—(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided
should the proposal be implemented, (iii) alternatives to the pro-
posed action, (iv) the relationship between local short-term uses
of man's environment and the maintenance and enhancement of
long-term productivity, and (v) any irreversible and irretrievable
commitments of resources which would be involved in the pro-
posed action should it be implemented.

Endangered Species Act provides that in taking *any* action authorized, funded, or carried out by the agency, *any* agency must meet a substantive requirement—it must not threaten listed species. *See Hill*, 437 U.S. at 188 n.34 (distinguishing NEPA, as a procedural statute, from the Endangered Species Act, as a substantive statute).

*Public Citizen* considered whether the Department of Transportation (DOT) was required to "take into account the environmental effects of increased cross-border operations of Mexican motor carriers." *Id*. at 765. The Supreme Court held that the agency was not required to do so, because it "has no ability to countermand the President's lifting of the moratorium or otherwise categorically to exclude Mexican carriers from operating within the United States." *Id*. at 766. In other words, NEPA's purposes would not be served by requiring the agency to engage in NEPA's procedural steps with regard to a decision it could not make. *Id*. at 769. Because the DOT in *Public Citizen* had no authority to determine whether to allow in the Mexican trucks, it had no occasion under NEPA to consider environmental factors in making such a decision.

Here, the central question concerns whether EPA has a substantive responsibility and authority, created by the Endangered Species Act itself, to refrain from taking action that threatens listed species. If it does, then there is nothing futile about considering whether endangered species will be affected, for that is the inquiry the statute dictates.

The difference between NEPA, a strictly procedural statute, and the Endangered Species Act, a partially substantive statute, is critical. *Public Citizen* determined because there was *no* statutory authority for the Department of Transportation to ban the Mexican trucks for environmental reasons, there were therefore no procedures mandated by NEPA to inform the phantom decision. Only the most myopic observer could fail to see the difference between a statute that simply provides a procedure to inform decisionmaking processes governed

entirely by other statutes from one that sets a *substantive* decisionmaking requirement.

The central dispute in this case concerns the reach of the substantive mandate of section 7 of the Endangered Species Act. The question in this case is one specific to the Endangered Species Act and depends only on the particular language, history, and administrative application of that statute. As to that question, *Public Citizen*, a case that has nothing to do with the Endangered Species Act here at issue and that construed a statute with *no* substantive import, emphatically does *not* "appl[y] equally to this case." Kozinski Dissent at 6296. Instead, *Public Citizen* is entirely uninformative on the key legal point in this case.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2006 Thomson/West.